# 98 DTA 124

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL SAN JUAN - III

DIRECTOR DE LA OFICINA DE ETICA GUBERNAMENTAL
Recurrido

v.

DRA. CARMEN FELICIANO DE MELECIO
Recurrente

Núm. KLRA-97-00767

San Juan, Puerto Rico, a 18 de marzo de 1988

Panel integrado por su Presidenta, Jueza Ramos Buonomo
y los Jueces González Román y Córdova Arone

González Román, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La Dra. Carmen Feliciano de Melecio (la Dra. Feliciano) solicita la revocación de una resolución dictada por la Oficina de Etica Gubernamental (la O.E.G). el 24 de septiembre de 1997, en la cual se le impuso una multa administrativa de quinientos dólares ($500) por una violación al Artículo 3.3(b) ██ de la Ley de Etica Gubernamental, Ley 12 de 24 de julio de 1985, según enmendada, 3 L.P.R.A. 1123.

El 11 de mayo de 1995, la O.E.G., por conducto de su representante legal, Lcdo. Santiago Martínez Miranda, presentó una querella contra la Dra. Feliciano imputándole violación al Art. 3.3(b) de la Ley de Etica Gubernamental. Alega la O.E.G. que mientras la Dra. Feliciano trabajaba como funcionaria del Municipio de San Juan, sostuvo una relación contractual con la Advance Community Health Services (Advance). Se alegó que Advance tenía un contrato con el Municipio de San Juan desde el 1988 hasta el 30 de junio de 1993, para establecer y operar el Instituto del SIDA (Instituto). La resolución recurrida sostiene que la Dra. Feliciano, como funcionaria del Departamento de Salud del Municipio de San Juan (el Departamento), era la persona que *"gestionaba y supervisaba las nuevas propuestas y las existentes con el Instituto del SIDA".*

La Dra. Feliciano plantea dos señalamientos de error. En el primero impugna la constitucionalidad del Artículo 3.3(b) de la Ley de Etica Gubernamental por alegadamente adolecer éste del defecto de vaguedad. En el segundo señalamiento de error, la Dra. Feliciano cuestiona las conclusiones de hechos de la O.E.G. en cuanto a la suficiencia de prueba.

La Dra. Feliciano comienza su discusión con el segundo señalamiento de error, por tal razón haremos lo propio y discutiremos primero dicho señalamiento.

La Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme, (L.P.A.U)., Ley 170 de 12 de agosto de 1988, 3 L.P.R.A. 2175, dispone que las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo. A estos efectos el Tribunal Supremo ha expresado que los tribunales de instancia no deberán intervenir con las determinaciones de hechos realizadas por el organismo administrativo especializado, si las mismas se encuentran fundamentadas por prueba amplia y sustancial desfilada ante el foro administrativo. *Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc. v. Col. de Optómetras de P.R.*, ___ D.P.R. ___ (1993), **93 J.T.S. 12**, a la pág. 10249. Merece deferencia sustancial la interpretación del organismo al cual le compete administrar un estatuto, y dicha interpretación no necesita ser la única razonable para que merezca esa deferencia, bastando con que sea razonable y consistente con el propósito legislativo. *Comisionado de Seguros de P.R. v. General Accident Insurance Co. of P.R., Ltd.* ___ D.P.R. ___ (1993), **93 J.T.S. 10.**

La Dra. Feliciano sostiene que *"es necesario concluir que la prueba desfilada no estableció un sólo acto demostrativo de la alegada participación o influencia [de su parte] en las "decisiones institucionales" de la agencia ni [un] sólo acto demostrativo de la alegada facultad de ésta para influenciar en dichas determinaciones".* Por su parte, la O.E.G. llegó a la conclusión de que la Dra. Feliciano, a través de sus funciones en el Departamento, tenía la facultad para influenciar en el Municipio de San Juan respecto a Advance. Las funciones de la Dra. Feliciano consistían en:

*"1. Supervisar la implantación de los programas médicos dirigidos a los pacientes de SIDA;*

*2. Preparar las propuestas para fondos federales dirigidas a programas de SIDA;*

*3. Preparar los informes relacionados con el programa de SIDA a ser suscritos por el Director del Departamento de Salud, en los cuales se detallaba y certificaba la forma en que los fondos eran utilizados;*

*4. Supervisar la facturación sometida por Advance al Municipio relacionada con los programas del SIDA;*

*5. Verificar la facturación sometida por Advance al Municipio relacionada con los programas del SIDA;*

*6. Evaluar la efectividad de las propuestas y programas de SIDA."*

Hemos examinado detalladamente el expediente administrativo y del mismo surge evidencia sustancial para sostener las conclusiones de la Oficial Examinadora de la O.E.G., según exponemos a continuación.

La O.E.G. concluyó que la Dra. Feliciano tuvo la encomienda de verificar que los servicios que ofrecía Advance a los pacientes de SIDA se dieran como se habían especificado en las propuestas federales. Así surge del propio testimonio prestado por la Dra. Feliciano en la vista administrativa del 25 de junio de 1997 quien, a preguntas de la Lcda. Rodríguez, expresó que tenía que supervisar los servicios que el Municipio de San Juan se había comprometido a prestar y había delegado en el Instituto del SIDA para que lo hiciera (Véase las págs. 27-29 y 48-49 de la transcripción, Ap. 1 del Escrito en Oposición. [2] Otras conclusiones de la O.E.G. establecen que había firmado como decir que la Dra. Feliciano participó en la preparación de las propuestas federales que se sometían al Dr. Borrás, Director del Departamento de Salud del Municipio de San Juan. Véase pág. 33 de la transcripción. [3] Además, que la obtención de fondos federales, a través de las propuestas federales que se prepararon, beneficiaron tanto al Municipio como a Advance (a las págs. 64 y 66). Que los datos recopilados e informes preparados por la Dra. Feliciano para Advance iban dirigidos a informar al Municipio y a las agencias que concedían fondos sobre el progreso en la prestación de los servicios (véase las páginas 36, 37 y 39 de la declaración jurada prestada por el Dr. Pedro Borrás en la vista del 13 de marzo de 1996).

En múltiples ocasiones, el Tribunal Supremo ha reiterado la norma de que no intervendrá con las conclusiones de hechos de un organismo administrativo siempre que las misma estén sostenidas por la

evidencia sustancial tomando en récord en su totalidad. *Puerto Rico Telephone Co. v. Unión Independiente de Empleados Telefónicos*, __ D.P.R. __ (1992), **92 J.T.S. 93.**

Evidentemente, a la luz de la evidencia examinada, no hay razones para intervenir con las conclusiones de la O.E.G., y menos estimarlas como arbitrarias o caprichosas. Procede que las confirmemos. El hecho de que la Dra. Feliciano trabajara para el Municipio de San Juan y se ocupara de supervisar los programas médicos dirigidos a pacientes del SIDA y preparar informes y propuestas para fondos federales dirigidas a programas de SIDA, y a la misma vez trabajara para Advance, recopilando datos y preparando informes dirigidos al Municipio de San Juan y a las agencias federales que concedían los fondos operacionales, claramente viola el propósito del Art. 3.3(b) de la Ley de Etica Gubernamental, *supra*. No hay duda de que la Dra. Feliciano tenía facultad para decidir o influenciar las actuaciones oficiales de la agencia.

Cabe señalar que el Art. 3.3(b), *supra*, prohibe la duplicidad de funciones al empleado público que participe en las decisiones institucionales de la agencia o que tenga dificultad para decidir o influenciar las actuaciones oficiales de la agencia. Podríamos decir que dicho artículo es de efectos profilácticos o preventivos, por lo que no es necesario probar que el funcionario público haya ejercido o no influencia a favor de una u otra parte. Las normas de ética son para velar porque la conducta de quienes deban sujetarse a éstas ni tan siquiera tenga la apariencia de irregularidad. Basta con que el funcionario público que participe en las decisiones institucionales de la agencia o tenga facultad para decidir o influenciar las actuaciones oficiales de la misma, acepte un empleo o mantenga relaciones contractuales de negocio con una persona, negocio o entidad que esté reglamentada por o que haga negocios con la agencia gubernamental para la cual él trabaja. En el caso de autos se probaron todos los elementos, a saber: a)- la Dra. Feliciano, al momento de suscribir el contrato con Advance, se desempeñaba como funcionario público, b)- en su posición en el Departamento tenía facultad para influenciar en las decisiones de la agencia y, por último, c)- Advance mantenía relaciones contractuales con el Departamento. No se cometió el señalamiento discutido. Veamos el próximo señalamiento.

Procede ahora dictaminar sobre el segundo señalamiento de error que, como adelantáramos al principio de esta sentencia, plantea que el Art. 3.3(b) de la Ley de Etica Gubernamental, *supra*, adolece de visos de inconstitucionalidad por sufrir de vaguedad en cuanto a su construcción. Advertimos que, a nuestro juicio, conforme a la norma de abstención judicial respecto a cuestiones constitucionales, resulta innecesario dilucidar la constitucionalidad de la disposición en controversia. Como hemos visto, la médula del asunto ante nos es la corrección de la interpretación y evaluación hecha por el Oficial Examinador del estatuto de la Agencia y de la prueba desfilada ante sí en la vista administrativa, lo cual ha quedado confirmado. Entrar a dilucidar si la sección de ley en controversia adolece o no de vaguedad en cuanto a su construcción, más que servir a los méritos del caso, tendería a desvanecer la importancia y seriedad del asunto en controversia.

No existiendo razones legales que obliguen a este Tribunal a alterar la resolución recurrida, se expide el auto de revisión solicitado y se confirma la misma.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

**ESCOLIOS 98 DTA 124**

**1.** Art. 3.3(b) de la Ley de Etica Gubernamental.

*"Ningún funcionario o empleado público aceptará un empleo o mantendrá relaciones contractuales de negocio con una persona, negocio o entidad que esté reglamentada por o que haga negocios con la agencia gubernamental para la cual él trabaja cuando el funcionario o empleado público participe en las decisiones institucionales de la agencia o tenga facultad para decidir o influenciar las actuaciones oficiales de la agencia que tengan relación con dicha persona, negocio o entidad."*

**2.** Página 27:

*"DOCTORA FELICIANO:*

*"Eh, yo quisiera que ustedes entendieran las propuestas las sometía el Municipio de San Juan. Era... eh, eh quien ante el Gobierno Federal era responsable, por lo tanto las funciones que yo hacía del Instituto, este... de monitoriar que todo eso se hiciera adecuadamente. Lo que yo hacía era eh, verificar o, o garantizar que el Municipio de San Juan quedara bien y que eso que se había puesto ahí que el doctor Borrás lo había firmado como decir que el que el Municipio lo iba a hacer, pues el Municipio no lo hacía, sino que contrataba al Instituto. Ese personal lo contrataba el Instituto, pero yo tenía que supervisar eso que el Municipio de San Juan se había obligado hacer y que delegaba en el Instituto de SIDA que lo hiciera, la fase operacional de servicio directo." Página 28:*

*LICENCIADA RODRIGUEZ:*

*"¿Estaba adscrita al Instituto físicamente pero hacía funciones públicas? Como me dijo...."*

*DOCTORA FELICIANO:*

*"Yo quisiera decirlo en mis palabras si alguien, si no hay objeción, verdad, yo era una empleada regular del Municipio de San Juan, destacada por el Secretario de Salud de San Juan, el doctor Borrás, destacada en el Instituto y yo tenía que garantizar que el servicio directo a los pacientes se diera como decía esas propuestas que se iban a dar. Así que sí, yo era una empleada regular destacada en el Instituto del SIDA de San Juan durante esas horas eh, laborables, que para yo garantizar que el servicio se diera de acuerdo a lo protocolo y a lo que decidían las agencias federales y lo que se comprometió el Gobierno Municipal de hacer." Páginas 48-49:*

*LICENCIADA RODRIGUEZ:*

*"Y esos servicios entonces que se prestaban eran supervisados por quién, ¿por el doctor?"*

*DOCTORA FELICIANO:*

*. "Bueno, habían varios niveles de supervisión. Había un Director Ejecutivo, que era el Dr. Jaime Rivera Dueño, había un gerente operacional que era la Lcda. Janet Sotomayor, como yo dije ahorita, había un Director Médico, este... y había pues, eh, una sesión de... personal y fiscal y había una Junta de Directores que yo o eh, no sé todos lo nombres, o sea, y se daban unos servicios a una población. Y esos servicios a una población tenían que tener eh, unas características, una calidad y tenían que llevar a cabo, eh, una serie de normas y de procedimientos, ya que el Gobierno Federal pues aportaba un dinero para que eso se hiciera. Ya esa fase operacional de dar servicios directos a la población era mi responsabilidad." Página 33:*

*LICENCIADA RODRIGUEZ:*

*"Nos habíamos quedado... en el momento en que usted trabajaba en el Municipio, antes de moverse al Instituto del SIDA. Usted nos había dicho anteriormente que usted trabajaba con asuntos fiscales, con propuestas."*

*DOCTORA FELICIANO:*

*"Ok. Al decir "asuntos fiscales" vamos quizás a explicar mi intervención en asuntos fiscales, vuelvo a señalar, verdad asuntos fiscales en la plenitud de... sino sencillamente en yo verificarle al doctor que si una factura decía que había un educador y la propuesta contemplaba que había un educador solicitado. Esa era mi intervención fiscal. ¿Quién preparaba las propuestas? Las preparábamos en un grupo. Yo participaba en ellos. Había una oficina de planificación. La Sra. Gloria Negrón la dirigía y habían evaluadores y planificadores que*

*participaban en ese proceso y el doctor Jaime Rivera Dueño como Director Ejecutivo y conocedor del SIDA, pues podía aportar desde el punto de vista de ideas de qué programas desarrollar, etcétera. Eh, también el Harvard Institute International Development eh,... personal de ese Instituto también podía. en algún momento, asesorar en la preparación de las propuestas. Todas las propuestas tenían que ver con servicio directo a los pacientes, eh, propuestas de servicios a pacientes eh, pediátricos, a curaciones general, este..."*

*LICENCIADA RODRIGUEZ:*

*"Eso además de la preparación de (no se entiende)"*

*DOCTORA FELICIANO:*

*"O, sea, que no era una sola persona sino que era un grupo de trabajo, verdad, y yo participaba en él."*
*Página 64:*

*LICENCIADO GONZALEZ:*

*"Los fondos, las propuestas federales que ya usted ha dicho que eran producto de unos grupos que trabajan esas propuestas, ¿si esas propuestas eran en beneficio del Municipio el que el Gobierno Federal las aprobara?*

*DOCTORA FELICIANO:*

*"Bueno claro. Este si nosotros no conseguíamos dinero federal, iba a pasar una de dos: o el paciente no se atendía, no recibía los servicios, lo cual es negativo o el Municipio iba a tener que poner fondos adicionales municipales para cubrir eso. Así es que el conseguir fondos federales, este vino en beneficio de la buena gente de San Juan."*

*LICENCIADO GONZALEZ:*

*"¿Y era en beneficio del Instituto también?*

*DOCTORA FELICIANO:*

*"Si, pero era en beneficio del Municipio de San Juan."*

**3.** Esto es, que este Tribunal no entrará a resolver una cuestión constitucional si existen fundamentos de otra índole que permitan disponer del caso. *E.L.A. v. Aguayo,* 80 D.P.R. 552 (1958).